21-MJ-2645-MBB

# AFFIDAVIT OF SPECIAL AGENT JOHN MERCER

I, Special Agent John Mercer, depose and state as follows:

## I

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant in furtherance of an investigation conducted by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for the premises located at 49 Vane Street, Revere, Massachusetts, which is a residence used by Juan ZAPATA ("ZAPATA") (hereinafter referred to as the "TARGET LOCATION). The TARGET LOCATION is more fully described in Attachment A-1.

2. The purpose of the search warrant is to seize: (1) property that constitutes evidence of the commission of a controlled substances offense under 21 U.S.C. § 841(a)(1), felon in possession of a firearm under 18 U.S.C. § 922(g), and possession of a firearm in furtherance of a drug trafficking crime under 18 U.S.C. § 924(c); (2) contraband, fruits of crime or things otherwise criminally possessed; and (3) property designed or intended for use or which is or has been used as a means of committing a criminal offense.

3. I am presently a Special Agent with the ATF and have been employed as such for approximately 30 years. I am currently assigned to work with other federal, state, and local law enforcement agencies in a task force effort focusing on federal firearms, explosives and controlled substance violations. Based on my training and experience as an ATF special agent, I am familiar with federal firearms and narcotics laws. In this regard, I know that it is a violation of 18 U.S.C. §922(g)(1) for a person previously convicted in a court of a crime punishable by imprisonment for

a term exceeding one year to possess a firearm or ammunition that has crossed state or national boundaries, or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.  On the same basis, I know that the possession element of a felon-in-possession charge can be satisfied by showing either actual or constructive possession, and by showing either sole or joint possession.  I also know it is a violation of 21 U.S.C. § 841(a)(1) to distribute and/or possess with intent to distribute controlled substances. I further know it is a violation 18 U.S.C. § 924(c) to possess a firearm in furtherance of a drug trafficking crime.

4.  I have conducted and been involved in hundreds of illegal firearm and drug-related investigations, arrests, seizures, undercover operations and search warrants.  I have written and/or participated in the execution of numerous state and federal search warrants, and have debriefed hundreds of defendants, informants, and witnesses with personal knowledge regarding illegal firearms possession and trafficking, narcotics trafficking activities and the operation of firearms and narcotics trafficking organizations.  I have also received training through my position as an ATF Special Agent involving narcotics trafficking.  Based upon my training and experience, I am familiar with narcotics traffickers' methods of operation, including distribution, storage, and transportation of narcotics.

5.  The information contained in this affidavit is based on my own investigation, oral and written reports by other law enforcement officers, physical surveillance, information from a confidential informant/cooperating witness, public records, database checks, and other investigations.  The dates and times in this affidavit are approximate.  Because this affidavit is submitted for the limited purpose of supporting issuance of a search warrant for the TARGET LOCATION, I have not presented every fact learned during the investigation, but only that information necessary to fully support probable cause for a warrant.

6.      During this investigation, a Cooperating Witness ("CW-1") made controlled purchases of fentanyl.  CW-1 has requested that his/her identity not be revealed for fear of reprisal or harm to his/her physical safety.  I am aware of CW-1's identity and have met with CW-1 personally.  CW-1 has provided accurate, truthful, and reliable information to law enforcement, including the ATF, DEA, and local police departments in the past and continues to do so to the present.  CW-1's criminal history includes multiple convictions for assault and battery and theft.  CW-1 is presently receiving monetary benefits from the ATF.  CW-1 is also seeking protection from retaliation based upon CW-1's cooperation with law enforcement in this case, including possible relocation.

## II

## PROBABLE CAUSE FOR ISSUANCE OF SEARCH WARRANT

## TARGET LOCATION

7.      I have reviewed ZAPATA's criminal record as maintained by the Massachusetts Criminal History Systems Board.  According to those records, ZAPATA has a criminal history including the following convictions: (1) on or about December 5, 2018, in Chelsea District Court, Breaking and Entering in the Nighttime with Intent to Commit a Felony; (2) on or about December 20, 2018, in Lynn District Court, Possession With Intent to Distribute a Class B Controlled Substance and Unlawful Possession of a Firearm Without a License to Carry a Firearm. I know from my training and experience that these offenses are felonies under Massachusetts law and carry a maximum penalty in excess of one year in state prison for each conviction.  ZAPATA's criminal history indicates that he reported his address to be the TARGET LOCATION.

8.     On June 22, 2021, CW-1 made a controlled purchase of approximately fifty (50) pills containing a detectable amount of fentanyl (hereinafter referred to as "fentanyl pills") from Rashid SPARKS and ZAPATA, in an apartment on Congress Street in Chelsea, Massachusetts. Prior to the controlled purchase, ATF agents met with and searched CW-1's person for contraband with negative results. Agents equipped CW-1 with an undercover vehicle and a recording device which recorded both audio and video; the device worked properly and recorded the transaction with SPARKS and ZAPATA. Agents provided CW-1 with official government funds in order to purchase the fentanyl pills. Surveillance personnel were assigned to the area of Congress Street. CW-1 was under constant surveillance by agents/officers during the operation. CW-1 met with SPARKS and ZAPATA and purchased approximately fifty (50) fentanyl pills. CW-1 paid SPARKS $500 for the fentanyl pills. During the buy, CW-1 observed SPARKS carrying an aerosol can and ZAPATA was wearing a "Gucci" bag over his shoulder. CW-1 observed SPARKS remove a large bag of fentanyl pills from the aerosol can as well as what appeared to be cocaine base; CW-1 is familiar with cocaine base. During the buy, SPARKS bragged about the quality of the fentanyl pills, but stated he was not trying to "kill anybody" with the pills. He then reached into his sweatshirt pocket and stated: "If I kill someone it's gonna be with this big ass gun." CW-1 observed the outline of what appeared to be a pistol in SPARKS' sweatshirt pocket as he handled it. A short time later, SPARKS and ZAPATA heard someone entering the apartment. CI-1 observed SPARKS and ZAPATA move toward the front door of the apartment. SPARKS reached into his sweatshirt pocket and CW-1 observed SPARKS partially remove what appeared to be a black pistol from his pocket. CW-1 observed ZAPATA open his Gucci bag and reach into the bag. ZAPATA kept his hand in the bag until SPARKS and ZAPATA realized it was a person with whom they were familiar entering the apartment. CW-1 subsequently left the

area and was kept under surveillance as he/she proceeded to a prearranged meeting site. At the meeting site, CW-1 provided agents with a plastic baggie containing approximately fifty fentanyl pills. Agents searched CW-1 for contraband and found none. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the fentanyl pills from SPARKS and ZAPATA.

9. The Department of Homeland Security, United States Customs and Border Protection Laboratory, Chicago, Illinois, analyzed the substance purchased from SPARKS and ZAPATA. The substance (with a weight of approximately 4.96 grams) was found to contain fentanyl, a Schedule II controlled substance.

10. On June 29, 2021, CW-1 made a controlled purchase of approximately fifty (50) fentanyl pills from SPARKS and ZAPATA, at a Market Basket parking lot in Revere, Massachusetts. Prior to the controlled purchase, ATF agents met with and searched CW-1's person for contraband with negative results. Agents equipped CW-1 with an undercover vehicle and a recording device which recorded both audio and video; the device worked properly and recorded the transaction with SPARKS. Agents provided CW-1 with official government funds in order to purchase the fentanyl pills. Surveillance personnel were assigned to the area of SPARKS' residence (280 Cross Street, Malden, Massachusetts) and the Market Basket parking lot. CW-1 was under constant surveillance by agents/officers during the operation. Surveillance personnel conducting surveillance at SPARKS' residence observed SPARKS and ZAPATA entering and exiting 280 Cross Street. Surveillance personnel observed SPARKS and ZAPATA conduct what appeared to be a drug transaction on Henry Street with an individual in a white SUV. The two returned to 280 Cross Street and then entered a vehicle, which was registered to SPARKS according to the Massachusetts Registry of Motor Vehicles. They drove directly to the Market

Basket parking lot. CW-1 met with SPARKS in the UC vehicle and purchased approximately fifty fentanyl pills. CW-1 paid SPARKS $500 for the fentanyl pills. SPARKS returned to his vehicle and left the area. CW-1 left the area and was kept under surveillance as he/she proceeded to a prearranged meeting site. At the meeting site, CW-1 provided agents with a plastic baggie containing approximately fifty fentanyl pills. Agents searched CW-1 for contraband and found none. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the fentanyl pills from SPARKS and ZAPATA.

11. The Department of Homeland Security, United States Customs and Border Protection Laboratory, Chicago, Illinois, analyzed the substance purchased from SPARKS and ZAPATA. The substance (with a weight of approximately 5.06 grams) was found to contain fentanyl.

12. On July 7, 2021, CW-1 made a controlled purchase of approximately one hundred (100) fentanyl pills from SPARKS, at the same Market Basket parking lot in Revere. Prior to the controlled purchase, ATF agents met with and searched CW-1's person for contraband with negative results. Agents equipped CW-1 with an undercover vehicle and a recording device which recorded both audio and video; the device worked properly and recorded the transaction with SPARKS. Agents provided CW-1 with official government funds in order to purchase the fentanyl pills. Surveillance personnel were assigned to the area of SPARKS' residence and the Market Basket parking lot. CW-1 was under constant surveillance by agents/officers during the operation. Surveillance personnel conducting surveillance at SPARKS' residence observed SPARKS exit his residence, enter his vehicle parked on Henry Street, and drive directly to the Market Basket parking lot. CW-1 met with SPARKS in the UC vehicle and purchased approximately one hundred fentanyl pills. CW-1 paid SPARKS $900 for the fentanyl pills.

SPARKS returned to his vehicle and drove back to his residence. CW-1 left the area and was kept under surveillance as he/she proceeded to a prearranged meeting site. At the meeting site, CW-1 provided agents with a plastic baggie containing approximately one hundred fentanyl pills. Agents searched CW-1 for contraband and found none. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the fentanyl pills from SPARKS.

13. The Department of Homeland Security, United States Customs and Border Protection Laboratory, Chicago, Illinois, analyzed the substance purchased from SPARKS. The substance (with a weight of approximately 10.04 grams) was found to contain fentanyl.

14. On July 10, 2021, Massachusetts State Police Troopers encountered SPARKS on Interstate 95 North in the Wakefield, Massachusetts, area after SPARKS was involved in a single car accident. Troopers determine that SPARKS was under the influence of drugs and was placed under arrest. SPARKS' vehicle was towed and an inventory search was conducted. Troopers seized a loaded Glock, Model 23, .40 caliber pistol (bearing serial number UTZ315) from the driver's side pocket door. Troopers also seized a Super-X Tire Inflator aerosol can with a false bottom from the rear of the driver's seat. The can contained what appeared to be cocaine and cocaine base as well as pills and a large amount of U.S. currency. SPARKS was subsequently charged with state firearm and drug violations.

15. On July 26, 2021, CW-1 made a controlled purchase of approximately one hundred (100) fentanyl pills from ZAPATA, in front of ZAPATA's residence, the TARGET LOCATION. Prior to the controlled purchase, ATF agents met with and searched CW-1's person for contraband with negative results. Agents equipped CW-1 with an undercover vehicle and a recording device which recorded both audio and video; the device worked properly and recorded the transaction

with ZAPATA. Agents provided CW-1 with official government funds in order to purchase the fentanyl pills. Surveillance personnel were assigned to the area of the TARGET LOCATION. CW-1 was under constant surveillance by agents/officers during the operation. CW-1 met with ZAPATA in the UC vehicle in front of the TARGET LOCATION and purchased approximately one hundred fentanyl pills. CW-1 paid ZAPATA $900 for the fentanyl pills. ZAPATA returned to the TARGET LOCATION. CW-1 left the area and was kept under surveillance as he/she proceeded to a prearranged meeting site. At the meeting site, CW-1 provided agents with a plastic baggie containing approximately one hundred fentanyl pills. Agents searched CW-1 for contraband and found none. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the fentanyl pills from ZAPATA.

16. On August 11, 2021, CW-1 made a controlled purchase of approximately two hundred (200) fentanyl pills from ZAPATA at the same Market Basket parking lot in Revere. Prior to the controlled purchase, ATF agents met with and searched CW-1's person for contraband with negative results. Agents equipped CW-1 with an undercover vehicle and a recording device which recorded both audio and video; the device worked properly and recorded the transaction with ZAPATA. Agents provided CW-1 with official government funds in order to purchase the fentanyl pills. CW-1 was under constant surveillance by agents/officers during the operation. Surveillance personnel observed ZAPATA arrive in the parking lot operating a blue 2001, Suzuki sedan, Massachusetts registration 2YMM54, (registered to Erica ZAPATA at 49 Vane Street, Revere, MA). CW-1 met with ZAPATA in the UC vehicle and purchased approximately two hundred (200) fentanyl pills. CW-1 paid ZAPATA $1800 for the fentanyl pills. CW-1 asked ZAPATA what was going to happen to SPARKS. ZAPATA told CW-1 SPARKS had court on Monday and was going to be indicted. CW-1 left the area and was kept under surveillance as

he/she proceeded to a prearranged meeting site. At the meeting site, CW-1 provided agents with a plastic pill bottle containing approximately two hundred fentanyl pills. Agents searched CW-1 for contraband and found none. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the fentanyl pills from ZAPATA.

17. On September 10, 2021, CW-1 made a controlled purchase of approximately two hundred (200) fentanyl pills from ZAPATA, in the driveway of the TARGET LOCATION. Prior to the controlled purchase, ATF agents met with and searched CW-1's person for contraband with negative results. Agents equipped CW-1 with an undercover vehicle and a recording device which recorded both audio and video; the device worked properly and recorded the transaction with ZAPATA. Agents provided CW-1 with official government funds in order to purchase the fentanyl pills. Surveillance personnel were assigned to the area of the TARGET LOCATION. CW-1 was under constant surveillance by agents/officers during the operation. CW-1 met with ZAPATA in the UC vehicle in the driveway of the TARGET LOCATION and purchased approximately two hundred fentanyl pills. CW-1 paid ZAPATA $1800 for the fentanyl pills. ZAPATA returned to the TARGET LOCATION. Surveillance personnel observed ZAPATA exit and enter the TARGET LOCATION. CW-1 left the area and was kept under surveillance as he/she proceeded to a prearranged meeting site. At the meeting site, CW-1 provided agents with a plastic baggie containing approximately two hundred fentanyl pills. Agents searched CW-1 for contraband and found none. I have reviewed the recording of the transaction, which confirmed CW-1's account that CW-1 purchased the fentanyl pills from ZAPATA.

18. On September 29, 2021, at approximately 11:50 p.m., Everett police officers attempted to conduct a motor vehicle stop of a black Honda sedan that was speeding in the city of Everett, Massachusetts. Everett police officers attempted to pull the vehicle over, but the vehicle

fled. After a brief high-speed chase, officers terminated the chase in the interest of public safety. A short time later officers observed the same vehicle stop in the area of Broadway on the Everett/Malden line. Officers observed the driver, later identified as ZAPATA, flee the vehicle on foot. A short time later ZAPATA was apprehended while hiding on the back porch of 61 Grover Street, Everett, Massachusetts. ZAPATA was arrest for multiple outstanding arrest warrants. Officers retraced ZAPATA's route to 61 Grover Street from the vehicle and recovered a Glock, Model 43, 9mm, pistol (bearing serial number BDEW912) and a magazine loaded with 6 rounds of 9mm ammunition from a driveway on Broadway. At that time of his booking, ZAPATA provided a residential address in Malden, MA. Based on our ongoing investigation, the address provided by ZAPATA is the address of another individual and not ZAPATA. ZAPATA appears to have provided a false address to the Everett officers as a means of avoiding identifying the TARGET LOCATION given that he had been arrested with an illegal firearm. To the best of my knowledge, ZAPATA has not been released from state custody following this arrest, and, thus, had not had an opportunity to return to the TARGET LOCATION.

19. The Massachusetts Registry of Motor Vehicles records system indicates that ZAPATA has an expired Massachusetts Identification Card, #S29312285, and that his address is the TARGET LOCATION. Multiple law enforcement databases list the TARGET LOCATION as ZAPATA's address, including entries made as recently as May 2021.

### III

### BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT

20. Through my training, experience, debriefings with drug traffickers, and consultation with other special agents and law enforcement officers, I have learned that:

    a. Individuals involved in drug trafficking maintain documents and other records related to their illicit business at their residence and locations associated with them,

including stash houses. Specifically, individuals involved in drug trafficking often maintain ledgers in order to keep track of the purchasing, storage, distribution, and transportation of drugs and/or the laundering of the proceeds of their drug sales. Even after the drugs are sold and/or used, documentary records and ledgers are often maintained for long periods of time to memorialize past transactions and to maintain the names, telephone numbers, and contact information for suppliers, customers, and co-conspirators. In my experience, premises used by drug traffickers (including stash houses) often contain documents and articles of personal property evidencing the identity of person(s) occupying, possessing, residing in, owning, frequenting or controlling the residence and premises.

      b.      Individuals involved in drug trafficking must often rely on others to obtain their drugs and/or the materials necessary to manufacture/distribute their drugs. Frequently, drug traffickers maintain evidence of the identities of these co-conspirators at premises associated with them and will maintain these types of materials even after drugs are sold or used.

      c.      Individuals involved in drug trafficking often store articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

      d.      Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these photographs at premises associated with them even after drugs are sold or used. Therefore, I am requesting permission to search for and to seize photographs that law enforcement agents determine to be of evidentiary value.

      e.      Individuals involved in drug trafficking use various tools, instruments, materials and other paraphernalia to facilitate their trafficking, including weighing the

drugs and packaging the drugs. These types of materials include, but are not limited to: scales, cutting materials, and packaging materials. These types of materials are often maintained at locations associated with drug traffickers even after drugs are sold or used. I am also aware that it is generally a common practice for traffickers to conceal at their residences large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. In this connection, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences, even after drugs are sold or used.

    f.  Individuals involved in drug trafficking keep weapons, including firearms, at the locations where they store their drug supplies in order to protect both themselves and their drugs from thefts and/or robberies. As noted above, during one of the controlled buys, ZAPATA acted in a manner consistent with him being armed with a firearm.

  21.  Based on my training and experience as an ATF Special Agent, I know that the great majority of firearms possessed in Massachusetts are manufactured outside this state. I am also aware that Smith and Wesson is the only major manufacturer of firearms in Massachusetts, and even many Smith and Wesson firearms are shipped outside of Massachusetts to dealers and distributors after they are manufactured, and then are later shipped back into this state for retail sale. Based on my training and experience as an ATF Special Agent, I also know that no ammunition is commercially manufactured in Massachusetts.

22.     Also, based on my training and experience as an ATF Special Agent, I know that individuals who own and possess firearms normally possess and maintain them for long periods of time.  People who own or possess firearms generally keep them on their person, in their residences, or in their vehicles, because firearms are somewhat expensive and do not easily wear out.  Firearms are similar in that regard to tools, which people typically buy and maintain over a long period of time.  It has also been my experience that people maintain firearms, along with ammunition for the firearms, in a location to afford ease of access and to provide security.

23.     Based on my training and experience as an ATF Special Agent, I know that individuals typically possess in their residences documents and other items that reflect their occupancy and control of the premises, such as personal mail, checkbooks, identification, notes, correspondence, leases, utility bills, rent receipts, financial documents, keys, and photographs.

## IV

## **CONCLUSION**

24.     Based on my training and experience, consultation with other special agents and law enforcement officers, and all of the facts and opinions set forth in this affidavit, there is probable cause to believe that federal crimes have been committed, including: (1) the distribution of, and possession to distribute, controlled substances in violation of 21 U.S.C. § 841(a)(1); (2) felon in possession of a firearm in violation of 18 U.S.C. § 922(g); and (3) possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c).  There is also probable cause to believe that property that constitutes evidence of the commission of the above-referenced offenses, contraband, fruits of crime or things otherwise criminally possessed,

and property designed or intended for use or which is or has been used as a means of committing a criminal offense will be found at the TARGET LOCATION described further in Attachment A.

Dated this 7th day of October 2021.

                                           */s/ John Mercer*
                                           John Mercer
                                           Special Agent, ATF

Sworn to before me by telephone this 7th day of October, 2021.

_____
The Honorable Marianne B. Bowler
United States Magistrate Judge